**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**AUDRA MOORE,**

**Plaintiff,**

**v.**

**UNIFIED GOVERNMENT OF WYANDOTTE COUNTY/KANSAS CITY, KANSAS,**

**Defendant.**

**Case No. 2:24-cv-02600-HLT**

## MEMORANDUM AND ORDER

Plaintiff Audra Moore is a female African-American police officer who also worked as a part-time security officer at a Board of Public Utilities (BPU) facility. Plaintiff was not given breaks or back-up when she needed to step away from her post at the main gate to use the restroom. Unauthorized individuals got past Plaintiff when she stepped away, and authorized individuals were made to wait at the gate when she took restroom breaks. Eventually Plaintiff's supervisor told her she was no longer wanted at that post. Plaintiff considered her employment terminated. She now claims that BPU violated Title VII when it subjected her to disparate treatment and terminated her employment on the basis of her race and sex.

The overarching problem with Plaintiff's case is that no reasonable jury could find that her employer discriminated against her on the basis of her race or sex. The more specific problem with her case under the *McDonnell Douglas* three-part test is that her prima facie case (step one) lacks evidence of both an adverse employment action and any circumstances giving rise to an inference of discrimination. The Court therefore grants summary judgment in favor of Defendant Unified Government of Wyandotte County and Kansas City, Kansas.

## I. BACKGROUND[1]

Plaintiff is an African-American female. She began working at BPU in 2015. She was a security officer. She may have started as an independent contractor, but she later transitioned into a part-time employee. Plaintiff also maintained her job as a law enforcement officer for the Kansas City Kansas Police Department (KCKPD). BPU hired KCKPD officers and used a third-party contractor, GardaWorld, to fill security posts when needed.

Randy Eskina, a white male, was Plaintiff's supervisor. He is a former KCKPD officer. Either Eskina or Plaintiff's son recruited her to work for BPU. Plaintiff's husband and son are both black, were law enforcement officers with KCKPD, and worked for BPU. Eskina supervised all security officers. Security officers could switch shifts when necessary by texting or calling Eskina. It was common procedure for security officers to call BPU when they wanted work. Some officers took time off for months at a time to perform other work.

Jeff Wry became BPU's new Manager of Safety and Security in 2021. He was Eskina's immediate supervisor. Wry is a white male. Eskina thought that Plaintiff was "less than well liked" by Wry. Doc. 56-4 at 4. And Wry himself testified that Plaintiff was a "horrible officer." Doc. 56-5 at 6. Wry at one point asked Eskina to talk to Plaintiff about a perceived dress code violation. Eskina testified that Wry told him that "Plaintiff looked like she was going to Wal-Mart."

BPU employed three other female security officers while Plaintiff worked there, one of whom is also black. Plaintiff named roughly twelve security officers whom Eskina hired to work at BPU. Of the twelve named, eight are black.

[1] For purposes of summary judgment, the following facts are uncontroverted or recited in the light most favorable to the nonmoving party.

Plaintiff worked at several posts within BPU before she moved to the main gate (also referred to as the "guard shack"), which was a heavily trafficked location. Two security officers worked in the guard shack together until BPU hired Wry in August 2021. But Wry wanted only one officer in the guard shack, so officers worked alone when Plaintiff got the job there in 2022. GardaWorld continued using two guards at the shack. And occasionally there may have been two officers in the guard shack after Plaintiff stopped working there, but it would have been an exception for a specific event.

Plaintiff began at the guard shack in August 2022 and found the post to be a busy place to work. Security officers who worked there worked straight eight- or nine-hour shifts. This meant they did not have time away from their post and were expected to eat and use the restroom during their "downtime," or when there was no one at the gate. The guard shack has a refrigerator and restroom. Wry testified that there were one to two hours of downtime per shift, but Plaintiff testified that she "had no relief," so she had to "squeeze in a lunch or take a few bites to eat in between work." Doc. 57-5 at 11. She asked Eskina for help. But Eskina told Plaintiff that Wry said only one security officer in the guard shack.

Security officers working at the guard shack were expected to maintain the facility's flow of traffic and complete "gate logs" to record who entered and exited the building. There were printed stacks of gate logs in the guard shack for security officers to complete. The logs were periodically audited. Eskina instructed Plaintiff to complete logs, including "all elements of the sheet," and Plaintiff admits that Eskina gave her "a little bit more instruction based on people getting past me." Doc. 56-2 at 20. But Plaintiff's husband worked at the guard shack for around two to four weeks, and said he did not have to keep gate logs. And no gate logs were produced for the GardaWorld contractors when they worked shifts between February-June 2023.

Wry testified that people complained "constantly" to him about Plaintiff while she worked at the guard shack. Doc. 56-5 at 18. People started "getting past" Plaintiff because she was told to leave the gate open when she used the restroom. Doc. 56-2 at 16. She allowed multiple non-BPU individuals to breach the main gate on separate occasions. Eskina asked if he could get a second guard at the gate to cover when Plaintiff used the restroom. That request was denied, so Eskina told Plaintiff to close the gates when she used the restroom and put up signs on the guard shack that said "In Restroom." But this created a new problem. Wry said numerous times people had to sit at the gate for fifteen to twenty minutes to wait for Plaintiff to open the gate.[2] Trucks would line up outside the building and down the street while Plaintiff was in the restroom, with drivers honking their horns. The drivers got angry when they wanted to come through the gate but the gate was closed because Plaintiff was in the restroom. And the phone would start ringing back-to-back while Plaintiff was in the restroom. Plaintiff asked Eskina whether anyone else was getting complaints about anything, and he said no.

A customer breached the gate on Plaintiff's watch on June 15, 2023. Wry thought Plaintiff needed to be moved to a lower-traffic location after this breach. Eskina emailed BPU Human Resources on June 20 and stated:

> In answer to this latest incident, I was made aware of a breach on the day it occurred referenced herein. [Plaintiff] stated that numerous vehicles were incoming to the radio shop, (fire dept. etc.) & she believes she was not able to detect someone getting on the premise due to the increased activity. It is a fact then she was at fault which she acknowledged. I had recently advised her that her performance was considered below the standard & that she may see consequences associated with sub-standard work if it did not improve.

2 Wry received complaints that the gate was closed for fifteen or twenty minutes. Plaintiff testified that she may take two to five minutes in the restroom, but because the gate was so busy, cars could line up within a matter of thirty seconds.

Doc. 56-12 at 1. That same week, Eskina told Plaintiff on the phone, "They don't want you back at the gate." After this comment, Plaintiff was not scheduled to work at another BPU location. She was not offered another assignment, and Plaintiff did not request additional shifts or another assignment. Plaintiff believed she had been terminated, but no BPU employee ever told her that she had been fired or terminated. Neither Wry nor Eskina had authority to terminate an employee. Both of them thought Plaintiff could have worked at another post at BPU; she only was limited from working at the guard shack. But Plaintiff never called in and asked to work another location after getting Eskina's phone call about working at the guard shack.

## II. STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). Courts applying this standard view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a reasonable jury could return a verdict for the nonmoving party." *Id.* (internal quotation and citation omitted).

## III. ANALYSIS

Plaintiff claims that Defendant violated Title VII by discriminating against her on the basis of her race and sex. "Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Ames v. Ohio Dep't of Youth Servs.*, 605 U.S. 303, 305 (2025). The Supreme Court set out in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973),

a three-step burden shifting framework for analyzing Title VII claims that lack direct evidence of discrimination. The Court applies the three-step framework to resolve Defendant's motion because Plaintiff lacks direct evidence of discrimination.[3]

In the first step, a plaintiff is required to make out a prima facie case of discrimination against the defendant. *Ames*, 605 U.S. at 308. This initial burden is not particularly onerous. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). It generally requires that a victim suffered an adverse employment action taken under circumstances giving rise to an inference of discrimination. *See Ames*, 605 U.S. at 308. At the second stage, the burden shifts to the defendant to offer a lawful, nondiscriminatory justification for the employment decision at issue. *Id.* at 308-09. A defendant's burden at this stage is simply one of production, not persuasion. *Burdine*, 450 U.S. at 254-55. At the third stage, the burden shifts back to the plaintiff to show that the defendant's explanation is not to be believed and is just a pretext for discrimination. *Ames*, 605 U.S. at 309.

Plaintiff's claims do not survive the first step, but the Court analyzes all three steps for completeness and as alternative rulings.

### A. Prima Facie Case

Plaintiff contends that Defendant terminated her employment under circumstances giving rise to an inference of unlawful discrimination on the basis of race (African American) or sex (female). Doc. 57 at 23, 26. She contends the following facts give rise to an inference of discrimination: Defendant subjected her to disparate treatment by (a) making her work at the guard shack by herself; (b) making Plaintiff hang a sign at the main gate when she used the restroom; (c)

---

[3] The Court is mindful that the *McDonnell Douglas* framework has been criticized as atextual gloss. *See, e.g.*, *Ames*, 605 U.S. 313-14 (Thomas, J., concurring); *Hittle v. City of Stockton*, 604 U.S. --, 145 S. Ct. 759, 760 (2025) (Thomas, J., dissenting from denial of certiorari); *Jenny v. L3Harris Techs., Inc.*, 144 F.4th 1194, 1202 (10th Cir. 2025) (Eid. J., concurring). But it remains the governing framework for Title VII claims in the Tenth Circuit. *See, e.g.*, *McCray v. Collins*, 2026 WL 2043493, at *5-*6 (10th Cir. 2026).

requiring her to complete gate logs when others were not required to; (d) not allowing Plaintiff to take breaks or have time to eat lunch; (e) monitoring her with video surveillance, capturing still shots, and making fun of her appearance; and (f) failing to offer her hours, assistance, or a different position after telling her she was not wanted at the guard shack.

**1. Termination.**

The first problem is that no reasonable jury could find that Defendant terminated Plaintiff's employment. Plaintiff clearly asserts one alleged adverse employment action: she was told she was not wanted at the guard shack, which Plaintiff considered "termination." Doc. 57 at 23, 26. But Plaintiff has not come forward with evidence from which a reasonable jury could agree with her. There is no evidence that either Wry or Eskina told Plaintiff she was "terminated" or "fired." There is no evidence that either Wry or Eskina had authority to terminate Plaintiff. No one told Plaintiff she was terminated. There is no evidence of termination paperwork or processes. There is no evidence that she asked for an appointment to another post after Eskina told her she was not wanted at the guard shack. There is no evidence that she asked whether she was eligible for other appointments and told no. The evidence instead indicates that officers regularly reached out when they wanted to be scheduled because officers took time off to perform other work. Both Wry and Eskina thought Plaintiff could work at another post had she expressed an interest. There is no evidence that Plaintiff ever reached out for more work and was told "no." Without termination, Plaintiff has not shown a prima facie case. The analysis ends here.

**2. Inference of Unlawful Discrimination.**

But, even if a reasonable jury could find that Defendant terminated Plaintiff's employment, her prima facie case still fails. Plaintiff has not come forward with evidence from which a reasonable jury could find that her termination occurred under circumstances giving rise to an

inference of unlawful discrimination on the basis of race (African American) or sex (female). At a high level, most of the other officers were African American males and there were three other females (one of whom is African American). There is no evidence that any other security officer allowed multiple security breaches. There is no evidence that any other security officer was the subject of multiple complaints. There is evidence that Wry may not have liked Plaintiff and that he may not have thought she was a good security officer. But there is simply no evidence that gives rise to an inference of unlawful discrimination. The Court briefly discusses each of the facts Plaintiff contends gives rise to an inference of discrimination.

**Working the guard shack alone.** Plaintiff claims she worked at the guard shack alone. The evidence shows that Plaintiff was not the only security officer who worked at the guard shack alone. Wry decided that the guard shack would have only one security officer on a regular basis when he was hired. There may have been exceptions for special events, and the contract guards (GardaWorld) continued with two workers at the guard shack. But the evidence shows that Plaintiff was not treated differently than any non-black or male security officer. And the practice was already in place before Plaintiff even started at the guard shack.

**"In Restroom" sign.** Plaintiff claims to be the only security officer who was required to hang a sign stating "In Restroom" when she stepped away from the gate. It appears Plaintiff was the first and only security officer asked to take this measure. But Plaintiff also acknowledges the impetus for the sign: Plaintiff allowed multiple breaches at the gate when she was in the restroom for extended periods of time. No other officer received complaints while at the guard shack. And Eskina testified that he also used the sign when he used the restroom. Plaintiff has presented no evidence suggesting that being asked to hang a sign when absent from her post gives rise to an

inference of unlawful discrimination. It instead appears to be an effort to minimize or address one of Plaintiff's struggles on the job.

**Gate logs.** Plaintiff argues that she alone had to complete gate logs tracking entry and exit of non-BPU visitors. This is not an accurate representation of the evidence. Wry testified that he required security officers to complete gate logs, and he retained them and audited them to ensure they were completed and BPU could tell who had been on and off the property. Exhibit H is a collection of eighty-six pages of gate logs from February through June 2023, some of which were completed by Plaintiff and many of which were completed by other security officers. Doc. 56-9. Eskina testified that security officers were required to complete gate logs and that he did so himself. Plaintiff's support for this argument is that her husband stated that no one told him to complete gate logs during the two to four weeks he worked at the guard shack. She also contends that GardaWorld staff did not complete gate logs. Plaintiff's husband is an African American male, so this information does not give rise to an inference of unlawful race discrimination. And GardaWorld staff are not similarly situated.[4] They are contractors, not employees. There is no indication that they worked under the same supervision or rules.

**Breaks and time for lunch.** Plaintiff contends that she was not given breaks or time for lunch while at the guard shack. But the record shows that all security officers worked a straight eight- or nine-hour shift. They were expected to use their downtime to eat lunch or use the restroom. There is no evidence that other security officers were not treated the same.

[4] The Court recognizes that Plaintiff is not obligated to identify similarly situated employees to meet her prima facie case. *See E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1195-96 (10th Cir. 2000). Nevertheless, it is relevant to the inquiry of whether Plaintiff has evidence suggesting an inference of discriminatory intent, as well as to the pretext inquiry. *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193, 1196, 1197 (10th Cir. 2021).

**Monitoring and making fun of appearance.** Plaintiff alleges that Wry monitored her with video surveillance, captured still shots, and made fun of her appearance by stating that she was dressed like she was going to Wal-Mart. Plaintiff contends that "Mr. Wry's statement about her dressing looking like she is going to Walmart was racially derogatory because she was the only black woman working at the guard shack and was being picked on because of the way she dressed." Doc. 57 at 24. And Plaintiff felt it was discriminatory for Wry to have taken a still shot of Plaintiff and passed it around while making a joke. There is evidence that Wry had access to the security shack cameras (as do others), but there is no evidence that he "monitored" Plaintiff with a video camera. There is evidence of one still photo of Plaintiff that Wry showed to Eskina because he thought Plaintiff was dressed inappropriately, wanted Eskina to talk to her, and he commented to Eskina that Plaintiff looked like she was going to Wal-Mart. Plaintiff also contends that she experienced patterns of behavior by white co-workers. She always greeted employees by saying "Good Morning." No one responded back except one black employee, and his white co-workers made fun of him and claimed that he was dating Plaintiff. But there is no evidence that Wry or Eskina never responded or that they treated her this way.

**Failure to offer options.** Finally, Plaintiff contends that Defendant should have offered her hours, assistance, or another position after telling her she was not wanted at the guard shack. But Plaintiff does not identify another, non-protected security officer who was treated differently after allowing security breaches. The evidence is that guards regularly contacted Eskina when they wanted to be scheduled. Plaintiff contends that she asked to be moved to another station before the final phone call with Eskina when he told her she was not wanted at the guard shack. Eskina had previously offered Plaintiff other positions, but she rejected them because they did not line up with her availability. Plaintiff has not offered any evidence that she was treated differently from any

other security officer in a similar situation. No reasonable jury could find that the circumstances give rise to an inference of discrimination based on race or sex.

In sum, Plaintiff lacks a prima facie case because she has not shown an adverse employment action and, alternatively, has not shown any circumstances (alone or collectively) giving rise to an inference of discrimination based on her race/sex. This dooms her Title VII claims.

**B. Legitimate, Non-Discriminatory Reasons for Actions**

Even if Plaintiff had established a prima facie case of discrimination, Defendant has proffered legitimate, non-discriminatory reasons for its actions. Defendant removed Plaintiff from the guard shack because of multiple complaints about her performance at that post. She allowed several gate breaches. Eskina advised Plaintiff to complete the gate logs more carefully because of the gate breaches. And she was asked to close the gate and place the "In Restroom" sign at the guard shack because of the breaches. Then, Plaintiff received more complaints when she closed the gate for extended periods of time while in the restroom.

**C. Pretext**

The burden in the third step reverts to Plaintiff. She must come forward with evidence from which a reasonable jury could find that Defendant's proffered reason is a pretext for unlawful race/sex discrimination. She has not carried that burden.

There are several ways an employee can show her employer's proffered reasons for an adverse employment action is pretextual. One way is that the employee may show that the reason was factually false or that discrimination was a primary motivating factor. *Thomas v. Farmers Ins. Exch.*, 448 F. Supp. 3d 1174, 1191 (D. Kan. 2020). An employee may also show evidence of "weakness, implausibility, inconsistency, incoherence, or contradiction in the employer's stated reasons," such that a reasonable jury could find them unconvincing. *Middleton-Thomas v. Piat,*

*Inc.*, 323 F. Supp. 3d 1218, 1232 (D. Kan. 2018). Or an employee may show that the employer treated similarly situated employees differently. *Id.* Plaintiff has not done any of these.

Plaintiff relies on many of the same facts to support her prima facie case in step one and pretext in step three. Plaintiff suggests that Defendant's treatment of her did not follow its handbook. She points out that the handbook allows breaks. And, per the handbook, Plaintiff believes that her attire was work-appropriate. She notes that Eskina replaced her at the guard shack with a male (her husband). And she notes how white co-workers treated her, Eskina's statement that Wry did not like Plaintiff, and Wry's description of Plaintiff as a horrible officer.

Plaintiff does not create a triable question over pretext. Plaintiff was one of a few female security officers. There is no evidence that any other female was treated differently than males; Plaintiff has presented no evidence that another female was monitored, laughed at, made to do extra jobs, or hang a sign when she used the restroom. Defendant had more African American security officers, but Plaintiff was the only black female who worked at the guard shack. This fact, however, does not call into question every act taken toward her as being based on race or sex. The record reveals no security officer who was similarly situated to Plaintiff in job performance at the main gate. It shows that all security officers did not receive breaks during their shift and all security officers in the guard shack had the same responsibilities and expectations. Plaintiff offers nothing but speculation and anecdotal examples of what other security officers were required to do on shift at the guard shack. Alone or collectively, these facts do not give rise to an inference of discrimination. This record is insufficient to survive Defendant's summary-judgment challenge.

## IV. CONCLUSION

By the time parties have engaged in discovery and solidified their claims and positions in the pretrial order, a plaintiff must have evidence to support the elements of her claims to survive a

dispositive motion. Plaintiff's claims here remain at the allegation stage; Plaintiff believes that Defendant discriminated against her based on her race and sex. And she believes that Defendant treated her differently than it treated other security officers. But there is simply no evidence to support Plaintiff's claims. At most, Wry did not like Plaintiff and poked fun at her work attire. He also believed that she was not good at her job and that she should not be left in charge of the main gate at the guard station. His conduct may not have been friendly or nice. But there is no indication that it was based on Plaintiff's race or sex. No reasonable jury could find otherwise.

THE COURT THEREFORE ORDERS that Defendant's motion for summary judgment (Doc. 55 ) is GRANTED. The case is closed.

IT IS SO ORDERED.

Dated: September 1, 2026

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE